UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| BSCV, Inc. (f/k/a Boscov's, Inc.), | : Jointly Administered |
| a Pennsylvania Corporation, et al., | : Case No. 08-11637 (KG) |
| | : |
| Debtors. | : |
| | : |
| BSCV Investment Company (f/k/a Boscov's | : 08-11635 (KG) |
| Investment Company) | : |
| | : |
| BSCV Finance Company, Inc. (f/k/a Boscov's | : 08-11636 (KG) |
| Finance Company, Inc.) | : |
| | : |
| BSCV Department Store, LLC (f/k/a Boscov's | : 08-11638 (KG) |
| Department Store, LLC) | : |
| | : |
| BSCV Transportation Company LLC (f/k/a Boscov's | : 08-11639 (KG) |
| Transportation Company LLC) | : |
| | : |
| BSCV PSI Inc. (f/k/a Boscov's PSI Inc.) | : 08-11640 (KG) |
| | : |
| BSCV II, Inc. (f/k/a SDS. Inc.) | : 08-11641 (KG) |
| | : |
| Retail Construction & Development, Inc. | : 08-11642 (KG) |
| | : |

---

**AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE OF JOINT PLAN OF BSCV, INC. (F/K/A BOSCOV'S, INC.) AND ITS DEBTOR AFFILIATES**

---

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. CERTAIN EVENTS, TRANSACTIONS AND OTHER MATTERS DISCUSSED IN THIS DISCLOSURE STATEMENT HAVE NOT YET OCCURRED OR REMAIN SUBJECT TO BANKRUPTCY COURT APPROVAL

DANIEL J. DEFRANCESCHI (DE 2732)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

- AND -

DAVID G. HEIMAN (OH I.D. 0038271)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939

BRAD B. ERENS (IL I.D. 6206864)
MARK A. CODY (IL I.D. 6236871)
MARC F SKAPOF (NY I.D. MFS 5746)
JONES DAY
77 West Wacker Drive
Chicago, Illinois 60601
(312) 782-3939

ATTORNEYS FOR DEBTORS

**March 16, 2009**

**DISCLOSURE STATEMENT, DATED FEBRUARY 6, 2009**
**SOLICITATION OF VOTES WITH RESPECT TO THE**
**JOINT PLAN OF BSCV, INC. (F/K/A BOSCOV'S, INC.)[1]**
**AND ITS DEBTOR AFFILIATES**

The Boards of Directors and Management of each of the Debtors believe that the Joint Plan of BSCV, Inc. (f/k/a Boscov's, Inc.) and Its Debtor Affiliates, dated February 6, 2009 and attached as Exhibit I (the "Plan") is in the best interests of creditors. All creditors entitled to vote thereon are urged to vote in favor of the Plan. Detailed voting instructions are set forth below, and contained on the Ballots distributed to creditors entitled to vote on the Plan. To be counted, your Ballot must be duly completed, executed and received by 5:00 p.m., Pacific time (8:00 p.m., Eastern time), on [_____], 2009 (the "Voting Deadline"), unless otherwise extended by the Debtors.

The Official Committee of Unsecured Creditors (the "Creditors' Committee") has independently concluded that the Plan is in the best interests of creditors and urges creditors to vote in favor of the Plan. Letters in support of the Plan from the Debtors and the Creditors' Committee are included with this Disclosure Statement.

As discussed below, the effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied.

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation, other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Debtors. Although the Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

**By an order of the Bankruptcy Court dated March [__], 2009, this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtors in accordance with section 1125 of the Bankruptcy Code. The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor [typical of the holders of claims or interests in the case] of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan . . . ." 11 U.S.C. § 1125(a)(1).**

All creditors are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan attached as Exhibit I and the Risk Factors described in Article VII hereof prior to submitting Ballots in response to this solicitation.

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto and documents described therein as being filed before approval of the Disclosure Statement. The Debtors will file all exhibits to the Plan with the Bankruptcy Court and make them available for review on the Document Website (**www.kccllc.net/boscov**) no later than ten days before the Voting Deadline.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors and other information regarding the Debtors, is included for purposes of

---

[1]    Pursuant to paragraph 35 of the order dated November 21, 2008 approving the sale of substantially all of the Debtors' assets, the Debtors were authorized by the Court to change their corporate names and the caption of their Bankruptcy Cases upon notice to all parties in interest. On December 12, 2008, the Debtors filed with the Court their notice of change of corporate names and case caption and served such notice on all parties in interest in these Bankruptcy Cases.

soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Article VII hereof. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward looking statements, whether as a result of new information, future events or otherwise.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings given to them in the Plan.

**TABLE OF CONTENTS**

Page

| | | | |
|---|---|---|---|
| I. | PRELIMINARY STATEMENT | | 1 |
| II. | OVERVIEW OF THE PLAN | | 3 |
| | A. | Introduction | 3 |
| | B. | Summary of Classes and Treatment of Claims and Interests | 4 |
| | C. | Voting on and Confirmation of the Plan | 6 |
| | | 1. Voting Procedures and Requirements | 6 |
| | | 2. Confirmation Hearing | 7 |
| | | 3. Confirmation Requirements | 7 |
| | | 4. Best Interests Test; Liquidation Analysis | 7 |
| | | 5. Conditions Precedent to the Effective Date of the Plan | 8 |
| | D. | Effect of Nonoccurrence of Conditions to the Effective Date and Amendments to or Revocation of the Plan | 9 |
| | E. | Alternatives to Confirmation and Consummation of the Plan | 9 |
| III. | HISTORY OF THE DEBTORS | | 9 |
| | A. | Historical Overview | 9 |
| | B. | Events Leading up to the Debtors' Chapter 11 Filings | 9 |
| IV. | CAPITAL STRUCTURE AS OF THE PETITION DATE | | 10 |
| | A. | General | 10 |
| | B. | Secured Debt | 10 |
| | | 1. Prepetition First Lien Credit Facility | 10 |
| | | 2. Prepetition Second Lien Credit Facility | 11 |
| | | 3. The Toms River Mortgage | 11 |
| | C. | Unsecured Debt | 11 |
| | | 1. Trade Debt | 11 |
| | | 2. Leasehold Obligations | 11 |
| | D. | Equity Interests | 11 |
| | | 1. Old Common Stock | 11 |
| | | 2. Subsidiary Debtor Equity Interests | 11 |
| V. | EVENTS DURING THE BANKRUPTCY CASES | | 12 |
| | A. | First Day Relief | 12 |
| | | 1. Key First Day Motions: | 12 |
| | B. | The DIP Credit Agreement | 12 |
| | C. | Appointment of the Creditors' Committee | 13 |
| | D. | Liquidation of Underperforming Stores | 13 |
| | E. | Sale of Substantially All of the Debtors' Assets | 14 |
| | F. | Shareholder Settlement | 15 |
| | G. | Bar Date Motion | 16 |

**TABLE OF CONTENTS**

Page

| | | | |
|---|---|---|---|
| | H. | Versa Motion for Payment of Breakup Fee | 16 |
| VI. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 16 |
| | A. | Continued Corporate Existence and Vesting of Assets in Newco | 16 |
| | B. | Other Means for Implementation of the Plan | 17 |
| | | 1. Post-Effective Date Transactions | 17 |
| | | 2. Corporate Governance and Directors and Officers | 18 |
| | | 3. Workers' Compensation Programs; No Change in Control | 18 |
| | | 4. Termination of All Employee Benefit Plans and Workers' Compensation Benefits | 18 |
| | | 5. Compliance with Section 1114 of the Bankruptcy Code | 18 |
| | | 6. Corporate Action Deemed as of the Effective Date; Duties and Powers of Newco | 19 |
| | C. | Administration of Newco | 19 |
| | | 1. Recourse Solely to Distributable Cash | 19 |
| | | 2. Newco Expense Reserve Account | 19 |
| | | 3. Reports to be Filed by the Responsible Person | 19 |
| | | 4. Purchaser Note | 19 |
| | D. | Effect of Confirmation of the Plan | 20 |
| | | 1. Sale and Settlement of Causes of Action by the Debtors | 20 |
| | | 2. Comprehensive Settlement of Claims and Controversies | 20 |
| | E. | Special Provisions Regarding Insured Claims | 20 |
| | F. | Cancellation of Old Common Stock and Subsidiary Debtor Equity Interests | 20 |
| | G. | Release of Liens | 20 |
| | H. | Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes | 21 |
| VII. | | RISK FACTORS | 21 |
| | A. | Risk of Non-Confirmation of the Plan | 21 |
| | B. | Nonconsensual Confirmation | 21 |
| | C. | Delays of Confirmation and/or Effective Date | 21 |
| | D. | Allowance of Claims | 21 |
| | E. | Priority Treatment of Certain Vendor Claims | 22 |
| | F. | Dependence Upon BLF | 22 |
| | G. | Expected Tax Refunds | 22 |
| | H. | Versa Breakup Fee Claim | 22 |
| VIII. | | DISTRIBUTIONS UNDER THE PLAN | 22 |
| | A. | Distributions for Claims Allowed as of the Effective Date | 22 |
| | B. | Method of Distributions to Holders of Claims | 23 |
| | C. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 23 |
| | | 1. Delivery of Distributions | 23 |

**TABLE OF CONTENTS**

Page

| | | | |
|---|---|---|---|
| | | 2. Undeliverable Distributions Held by Newco | 23 |
| | D. | Timing and Calculation of Amounts to Be Distributed | 23 |
| | | 1. Allowed Claims | 23 |
| | | 2. Distributions to Holders of Allowed Claims in Class 4 | 24 |
| | | 3. De Minimis Distributions | 24 |
| | | 4. Compliance with Tax Requirements | 24 |
| | E. | Distribution Record Date | 25 |
| | F. | Means of Cash Payments | 25 |
| | G. | Setoffs | 25 |
| IX. | | INJUNCTION AND SUBORDINATION RIGHTS | 26 |
| | A. | Injunction | 26 |
| | B. | Subordination Rights | 26 |
| | C. | Automatic Stay | 26 |
| X. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 26 |
| | A. | Executory Contracts and Unexpired Leases to Be Rejected | 26 |
| | B. | Bar Date for Rejection Claims | 26 |
| | C. | Executory Contracts and Unexpired Leases to Be Assumed | 27 |
| | | 1. Assumption Generally | 27 |
| | | 2. Assignments Related to Post-Effective Date Transactions | 27 |
| | | 3. Approval of Assumptions and Assumption Procedures | 27 |
| | D. | Payments Related to the Assumption of Executory Contracts and Unexpired Leases | 28 |
| XI. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN | 28 |
| | A. | General | 28 |
| | B. | United States Federal Income Tax Consequences of Payment of Allowed Claims | 29 |
| | C. | Recognition of Gain or Loss | 29 |
| | | 1. In General | 29 |
| | | 2. Post-Effective Date Cash Distributions | 29 |
| | | 3. Bad Debt or Worthless Securities Deduction | 29 |
| | D. | Certain Other Tax Consequences for Holders of Claims | 29 |
| | | 1. Receipt of Pre-Effective Date Interest | 29 |
| | | 2. Installment Method | 30 |
| | | 3. Information Reporting and Withholding | 30 |
| | E. | Tax Consequences of Consummation of Plan to Debtors and Newco | 30 |
| XII. | | ADDITIONAL INFORMATION | 30 |
| XIII. | | RECOMMENDATION AND CONCLUSION | 30 |

## TABLE OF EXHIBITS

**EXHIBIT I**      Joint Plan of BSCV, Inc. (f/k/a Boscov's, Inc.) and Its Debtor Affiliates

**EXHIBIT II**     Solicitation Order

**EXHIBIT III**    Chapter 7 Liquidation Analysis

## I.     PRELIMINARY STATEMENT

Prior to the filing of the Bankruptcy Cases, the Debtors owned and operated the nation's largest family owned, full-service department store chain in the United States. At its peak, the Debtors' retail footprint encompassed 49 department stores located in the Mid-Atlantic region, serving, in most instances, middle-sized markets in Pennsylvania, New Jersey, Maryland, New York and Delaware. Despite the Debtors' strong presence in many of their former operating locations, in the summer of 2008 the Debtors were besieged by a myriad of factors that collectively created insurmountable liquidity constrictions that resulted in the filing of the Bankruptcy Cases.

First, many of the communities in which the Debtors formerly operated were grappling with a collapse in the housing market and the general downturn in the economy, which led to dramatic declines in discretionary spending. Second, the Debtors were facing increasingly strained credit markets, which greatly impacted the Debtors' cash position, and significantly hampered the Debtors' ability to finance the acquisition of inventory and merchandise. Third, the Debtors' liquidity woes caused many of their trade vendors to tighten credit terms, require cash on delivery, or, in some cases, require cash in advance, which further eroded their precarious cash position and impaired their ability to stock adequate merchandise to meet traditional customer demands. As a consequence of these liquidity pressures, on August 4, 2008, the Debtors filed their petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

At the inception of the Bankruptcy Cases, in an effort to immediately reduce operating expenses and to boost their liquidity, the Debtors immediately sought and obtained Bankruptcy Court approval to close 10 under-performing retail locations that proved to be a considerable cash drain on the Debtors' operations. This downsizing, which was completed in mid-October 2008, successfully reduced the Debtors' expenses and overall cost structure, and significantly increased the Debtors' liquidity. Nevertheless, despite these positive results, the Debtors' businesses continued to require additional equity capital in order to achieve long-term viability. Indeed, the downward trends in the retail sector generally, as well as the constrictions in the capital markets, greatly limited the Debtors' ability to acquire goods in anticipation of the coming holiday season.

In the summer of 2008, at the direction of the Debtors, their investment banker, Barclays Capital, Inc. (f/k/a Lehman Brothers, Inc.) ("Barclays"), commenced a comprehensive process to find a buyer or investor as part of the Debtors' long-term chapter 11 strategy. Relatively early in the process, it became clear to the Debtors that any sale transaction or equity infusion likely would have to occur prior to the upcoming holiday season so that any potential buyer or investor could benefit from the Debtors' most lucrative sales season of the year. Accordingly, the Debtors moved with great urgency to explore a going concern sale transaction.

On September 30, 2008, the Debtors executed an asset purchase agreement (the "Regio APA") with Regio BDS, LLC ("Regio"), which contemplated the sale of substantially all of the Debtors' assets as a going concern. Regio was a newly created affiliate of Versa Capital Management, Inc. ("Versa"). In early October 2008, the Bankruptcy Court approved an expedited sale process in connection with the Regio APA, which contemplated a bidding deadline of October 15, 2008 for any competing qualified bids, an auction, if necessary, on October 20, 2008, and a sale hearing to commence on October 21, 2008.

On October 15, 2008 — the sale bidding deadline — the Debtors received only one other bid, from BLF Acquisition, Inc. ("BLF"), an entity owned by former management and shareholders of the Debtors led by Albert Boscov, the Debtors' previous chairman and chief executive officer. October 15, 2008 was also the deadline set forth in the Regio APA for Regio to provide the Debtors with documentation demonstrating that Regio had the requisite financing and equity commitments to close its purchase of the Debtors within the timeframe set forth in the Regio APA. As of October 15, 2008, the documentation submitted by Regio did not, in the Debtors' view, demonstrate that Regio had the requisite financing to close the transaction, and at that time, Regio proposed to the Debtors that the closing of any sale be deferred until January 7, 2009.

From the Debtors' perspective, a January 2009 closing presented several risks, including running afoul of their commitments to the Debtors' post-petition lenders, who had insisted that any sale close prior to December 2008. Nevertheless, the Debtors and Regio agreed to extend many of the sale-related deadlines, including certain termination rights, in an effort to secure a deal. At the same time, the Debtors continued negotiations with BLF regarding a potential sale transaction. As negotiations between the Debtors and their potential suitors progressed, it become increasingly clear to the Debtors, the Creditors' Committee and the Debtors' lenders that a sale transaction

with BLF would have several advantages over a transaction with Regio, not the least of which was that BLF could finance a transaction to close on the timeframe required by the Debtors' lenders. Consequently, on October 31, 2008, following a meeting of a special committee of the Debtors' board of directors, and with the consent of the Creditors' Committee, the Debtors terminated the Regio APA pursuant to section 4.4(e).

On November 3, 2008, with the support of the Creditors' Committee, the Debtors executed that certain Asset Purchase Agreement by and among Boscov's, Inc. and its Subsidiaries and BLF Acquisition, Inc. dated as of November 3, 2008 (the "BLF APA") for the sale of substantially all of the Debtors' assets to BLF. On November 21, 2008, the Bankruptcy Court approved a sale of the Debtors' assets free and clear of all liens and encumbrances to BLF, as well as the assumption and assignment to BLF of many of the Debtors' contracts and leases. On December 4, 2008, the Debtors closed the sale with BLF. As noted below, the proceeds of the sale have been used to pay down the Debtors' secured creditors. The remainder of the sale proceeds will be used to fund distributions under the Plan and to pay bankruptcy administrative costs.

The consideration paid by BLF under the BLF APA consisted of the following:

- All outstanding amounts owing under the Debtors' first lien debtor in possession revolving loan facility, dated August 5, 2008, among the Debtors, Bank of America, as agent, and a syndicate of lenders (the "DIP Lenders");

- All outstanding amounts owing (including any prepayment fees, make-whole payments or similar amounts) under the Debtors' pre-petition second lien credit agreement, dated March 20, 2008, among the Debtors, GB Merchant Partners LLC (as successor to Bearn Stearns Corporate Lending, Inc.), as administrative agent and collateral agent, and the lenders party thereto;

- Cash totaling $3 million, subject to possible adjustment upward under the BLF APA; and

- The assumption of various liabilities.

Additionally, as part of the consideration under the BLF APA, BLF was required to pay (i) the claims of certain holders of administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"), (ii) the administrative expense claims of Estate professionals (the "Administrative Professional Claims") for fees accrued but not yet paid prior to the closing of the sale, up to a cap, (iii) the amounts necessary to cure all monetary defaults under the contracts and leases purchased under the BLF APA, and (iv) certain other amounts. BLF's obligation to pay the 503(b)(9) Claims was capped at $10 million. Any 503(b)(9) Claims in excess of the $10 million cap are the responsibility of the Debtors' Estate. Upon the approval of the BLF APA, BLF paid to the Debtors approximately $7.9 million of the $10 million available to satisfy 503(b)(9) Claims. To the extent the 503(b)(9) Claims exceed the $7.9 million already paid by BLF, BLF will be required to pay such additional 503(b)(9) Claims up to $10 million, at which time the Debtors will be responsible for any additional 503(b)(9) Claims. To the extent that the 503(b)(9) Claims are less than $7.9 million in the aggregate, BLF is required to return the remainder to BLF. BLF's obligations to pay Administrative Professional Claims is capped at $8 million. In respect of contract and lease cure claims, BLF has paid to the Estate approximately $10.9 million, and in respect of Administrative Professional Claims, the Debtors received $5,547,342 at the closing of the sale from BLF.

In connection with the sale, the Creditors' Committee also settled potential claims of the Debtors' Estates against certain current and former shareholders (the "Shareholders") of the Debtors (the "Shareholder Settlement"). Certain of these Shareholders are affiliated with BLF. The Shareholder Settlement, which is outlined in greater detail below, was an integral part of the sale, and was necessary to procure the Creditors' Committee's support for the sale. The Shareholder Settlement consists, in general terms, of releases of liability among the parties in exchange for an $8 million cash payment from the Shareholders to the Estates on the closing of the BLF sale, and execution of a $4 million note by BLF (the "Purchaser Note") payable in annual installments on the 120th day after the end of BLF's fiscal year beginning with the fiscal year ending January 31, 2010 and ending on (and including) the fiscal year ending January 31, 2014, subject to certain conditions set forth in the Purchaser Note, including certain performance goals of BLF. The Shareholder Settlement was approved by the Bankruptcy Court in connection with the sale on November 21, 2008.

CHI-1695199v1

Since the closing, BLF has continued to operate the Boscov's retail chain as a going concern, in much the same fashion as it was operated by the Debtors prior to the Petition Date. The preservation of the Boscov's retail chain as a going concern has preserved thousands of jobs and maintained hundreds of vendor relationships in the Debtors' former operating locations. In light of the current capital market conditions, and the state of the retail industry generally, the going concern sale effectuated in the Bankruptcy Cases was a tremendous result for the Debtors, their estates, creditors and other parties in interest.

The purpose of the Plan is to bring the Bankruptcy Cases to a close by settling the remaining outstanding claims against the Estates with distributions from proceeds received by the Debtors' Estates as part of the BLF sale transaction, including the proceeds received by the Debtors on account of the Shareholder Settlement, as well as the proceeds of certain tax refunds and the Purchaser Note. A general discussion of the Plan's terms, its treatment of creditors and other relevant information follows below.

## II.  OVERVIEW OF THE PLAN[2]

### A.  Introduction

The confirmation of a plan of reorganization or liquidation, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the overriding purpose of a chapter 11 case. A plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan.

In these Bankruptcy Cases, the Plan contemplates a liquidation of each of the Debtors and is therefore referred to as a "plan of liquidation." The primary objectives of the Plan are to: (a) maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis; and (b) settle, compromise or otherwise dispose of certain claims and interests on terms that the Debtors believe to be fair and reasonable and in the best interests of the Debtors' respective Estates and creditors. As noted, the Debtors have liquidated substantially all of their assets. As such, the Debtors' assets consist almost exclusively of cash and the right to receive future cash from, among other things, tax refunds and the Purchaser Note. The Plan essentially provides for the distribution of such cash, after the payment of expenses of the Estates, to the holders of Allowed Claims in accordance with the priorities established by the Bankruptcy Code. The Plan also provides for, among other things: (i) the resolution of all claims against each of the Debtors in the manner set forth below, and in the Plan; (ii) the rejection of all unexpired Executory Contracts and Unexpired Leases to which any Debtor is a party that are not included on Exhibit III to the Plan or that have not been assigned to BLF as part of the sale, or otherwise previously assumed, assumed and assigned, or rejected by the Debtors, (iii) certain other transactions necessary to effectuate the terms of the Plan; and (iv) the ultimate dissolution of the Debtors.

Distributions to creditors under the Plan will be made from the Debtors' excess cash remaining in the Estate after payment of the Newco Expenses, which include the administrative costs and expenses of winding down the Debtors' Estates. As of the date hereof, the Debtors estimate having between $10 million and $13 million available to fund payments to General Unsecured Creditors in Class 4 under the Plan. In addition, the Debtors anticipate that they will receive tax refunds totaling $7.0 million during calendar year 2009, although there is no assurance that the Debtors will receive tax refunds in this amount or any amount. Substantially all of the tax refunds would arise from the carryback of an expected net operating loss for the Debtors' tax year ending January 31, 2009 to the Debtors' tax year ended January 31, 2007. If the Debtors receive the tax refund as expected, the Debtors anticipate being able to distribute between approximately $17 million and $20.1 million on account of Allowed Claims in Class 4 under the Plan after payment of the Newco Expenses. **It is important to note, however, that the foregoing estimates may be subject to significant change, as set forth in Article VII hereof.**

---

[2]    The overview of the Plan set forth herein is designed to simply provide a summary of the Plan's terms. To the extent that anything set forth in this Disclosure Statement is inconsistent with the terms of the Plan, the Plan will govern.

CHI-1695199v1

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan of liquidation are that the plan: (i) is accepted by the requisite holders of claims and interests in impaired classes of the debtor; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for the debtor; and (iii) complies with the applicable provisions of the Bankruptcy Code. In this instance, only holders of Allowed Claims in Classes 3 and 4 are entitled to vote on the Plan. See Section II.C of this Disclosure Statement for a discussion of Bankruptcy Code requirements for Plan confirmation.

**B.     Summary of Classes and Treatment of Claims and Interests**

The estimated aggregate amount of claims in each class, and the estimated amount and nature of consideration to be distributed to each class, is summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. The Debtors' estimates for recoveries by holders of Allowed Unsecured Claims in Class 4 are based on, among other things, the Debtors' current view of the likely amount of Allowed Administrative Claims incurred by the Debtors through confirmation of the Plan and the costs of administering and winding down the Debtors' Estates. There can be no guaranty that the Debtors' estimates will prove to be accurate.

The estimated amount of Claims shown in the table below are based upon the Debtors' preliminary review of their books and records and may be revised substantially following further analysis. In addition, the General Bar Date and Administrative Claims Bar Date (each as defined below) have not yet passed. Claimants may assert claims materially in excess of that shown for such claims on the Debtors' books and records. The amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated cash to be distributed to holders of Allowed Claims in such Class, divided by the estimated aggregate amount of Allowed Claims in such Class. For a discussion of various factors that could materially affect the amount of cash to be distributed to unsecured creditors under the Plan, see Article VII. For purposes of computations of Claim amounts, Administrative Claims and other expenses and for similar computational purposes, the Effective Date is assumed to occur on May 26, 2009. There can be no assurance, however, if or when the Effective Date will actually occur.

**SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN[3]**

| CLASS | TREATMENT | STATUS/ RIGHT TO VOTE | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Class 1 (*Prepetition First Lien Lender Claims*) | All agreed Prepetition First Lien Lender Claims were paid pursuant to the Final DIP Order. Disputed Prepetition First Lien Lender Claims for prepayment penalties that become Allowed Claims will be paid pursuant to the terms of the Final DIP Order and Sale Order from the indemnity account established for such claims. | **Unimpaired** **Not Entitled to Vote** | $0 | N/A |

---

[3]   The claim amounts set forth above are estimated amounts as derived from the Debtors' books and records. The Debtors intend to solicit votes on the Plan after the General Claim Bar Date and the Administrative Claim Bar Date have passed. As such, prior to delivery of any solicitation materials, the Debtors will update the Disclosure Statement to reflect the actual claim amounts based on proofs of claim received by the Debtors prior to the applicable Claim Bar Date.

- 4 -

| CLASS | TREATMENT | STATUS/ RIGHT TO VOTE | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Class 2 (*Miscellaneous Secured Claims*) | On the Effective Date, each holder of an Allowed Claim in Class 2 will be paid in full in Cash with postpetition interest if allowed. | **Unimpaired** **Not Entitled to Vote** | $0 | 100% |
| Class 3 (*Priority Claims*) | On the Effective Date, each holder of an Allowed Claim in Class 3 shall receive Cash equal to the amount of such Allowed Claim without postpetition interest, unless the holder of such Priority Claim and the applicable Debtor or Newco agree to a different treatment. | **Impaired** **Entitled to Vote** | $7.9 million | 100% |
| Class 4 (*General Unsecured Claims*) | Each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of Distributable Cash as set forth in, and on terms of, Section VI.D of the Plan. | **Impaired** **Entitled to Vote** | $140 million to $160 million | 6.3% to 14.4% |
| Class 5 (*Subordinated Claims*) | No property will be distributed to or retained by the holders of Allowed Subordinated Claims on account of such Claims. | **Impaired** **Not Entitled to Vote, Deemed to Have Rejected the Plan** | Unknown | 0% |
| Class 6 (*Prepetition Intercompany Claims*) | No property will be distributed to or retained by the holders of Allowed Prepetition Intercompany Claims on account of such Claims. Notwithstanding this treatment of Class 6 Claims, each holder of a Prepetition Intercompany Claim will be deemed to have accepted the Plan. | **Impaired** **Not Entitled to Vote, Deemed to Have Accepted the Plan** | N/A | 0% |
| Class 7 (*Old Common Stock Interests*) | No property will be distributed to or retained by the holders of Old Common Stock on account of such stock, and such Interests will be terminated and cancelled as of the Effective Date. | **Impaired** **Not Entitled to Vote, Deemed to Have Rejected the Plan** | N/A | 0% |

CHI-1695199v1

| CLASS | TREATMENT | STATUS/ RIGHT TO VOTE | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED PERCENTAGE RECOVERY |
|---|---|---|---|---|
| Class 8 (*Subsidiary Debtor Equity Interests*) | No property will be distributed to or retained by the holders of Subsidiary Debtor Equity Interests on account of such Interests, and such Interests will be terminated and cancelled as of the Effective Date. Notwithstanding this treatment of Class 8 Interests, each holder of a Subsidiary Debtor Equity Interest will be deemed to have accepted the Plan. | **Impaired Not Entitled to Vote, Deemed to Have Accepted the Plan** | N/A | 0% |

C.      Voting on and Confirmation of the Plan

### 1.      Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization, and who receive distributions under such plan, are entitled to vote to accept or reject the plan. Generally, a class is "impaired" under a plan unless such plan leaves unaltered the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest. Classes of claims and interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan. In addition, classes of claims and interests that do not receive distributions under the plan are not entitled to vote on the plan and are deemed to have rejected the plan. However, under the Plan, Classes 6 and 8 are nonetheless deemed to have accepted the Plan.

As set forth in the above chart, holders of Claims in Classes 3 and 4 are entitled to vote on the Plan. If either Class 3 or 4 votes to reject the Plan, (a) the Debtors may seek to satisfy the requirements for Confirmation of the Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code and, if required, may amend the Plan to conform to the standards of such section or (b) the Plan may be modified or withdrawn with respect to a particular Debtor, without affecting the Plan as to other Debtors, or in its entirety.

Please carefully follow all of the instructions contained on the Ballot or Ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan. All Ballots must be completed and returned in accordance with the instructions provided.

To be counted, your Ballot or Ballots must be received by the Voting Deadline at the address set forth on the preaddressed envelope provided to you. It is of the utmost importance to the Debtors that you vote promptly to accept the Plan.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call the Debtors' voting agent, Kurtzman Carson Consultants LLC, at (866) 381-9100. Also, this Disclosure Statement, the Plan and all of the related exhibits and schedules, including Ballots, are available, without charge, to any party in interest at www.kccllc.net/boscov.

Votes cannot be transmitted orally or by facsimile. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is received by the Debtors' voting agent on or before the Voting Deadline.

CHI-1695199v1

### 2.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after proper notice to parties in interest, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing with respect to the Plan has been scheduled for [_____], 2009 at [_____] [ ].m. (Eastern time) before the Honorable Kevin Gross, United States Bankruptcy Judge of the United States Bankruptcy Court for the District of Delaware at 824 North Market Street, 6th Floor, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and must specify in detail the name and address of the objecting party, all grounds for the objection and the amount of the Claim or Interest held by the objecting party.  Any such objections must be filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

### 3.    Confirmation Requirements

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by all impaired classes of claims and interests by the requisite number of votes; or, alternatively, at least one class of impaired claims or interests has voted to accept the plan (without counting the votes of insiders), and the plan otherwise meets the "cramdown" requirements with respect to any rejecting classes of claims or interests;

- the Plan is feasible;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date;

- the Plan provides for the continuation after the Effective Date of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time prior to Confirmation pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the applicable Debtor has obligated itself to provide such benefits; and

- the disclosures required under section 1129(a)(5) of the Bankruptcy Code concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Debtors or the successors to the Debtors have been made.

### 4.    Best Interests Test; Liquidation Analysis

In order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such impaired Class who has not voted to accept the Plan.  Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court

- 7 -

find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the applicable Debtor or Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired Class of Claims or Interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Bankruptcy Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds received from the disposition of the Debtor's assets plus any cash held by the Debtor.

The Liquidation Value available to holders of Interests or Claims that are not Secured Claims would be reduced by, among other things: (i) the Claims of secured creditors to the extent of the value of their collateral; (ii) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtor's chapter 7 case; (iii) unpaid Administrative Claims of the Bankruptcy Cases; and (iv) Priority Claims and Priority Tax Claims. The Debtors' costs of liquidation in chapter 7 cases would include the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, asset disposition expenses, applicable Taxes, litigation costs, Claims arising from the administration of the Debtors during the pendency of the chapter 7 cases and all unpaid Administrative Claims incurred by the Debtors during the Bankruptcy Cases that are allowed in the chapter 7 cases.

The information contained in Exhibit III hereto provides a summary of the Liquidation Values of the Debtors' interests in property, assuming a chapter 7 liquidation in which one or more trustees appointed by the Bankruptcy Court would liquidate each Debtors' properties and interests. In summary, the Debtors believe that chapter 7 liquidations would result in diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan. Consequently, the Debtors believe that the Plan will provide a greater ultimate return to holders of Claims than would a chapter 7 liquidation of each Debtor.

### 5.    Conditions Precedent to the Effective Date of the Plan

In addition to the requirements for confirmation set forth in the Bankruptcy Code, the Plan itself sets forth certain conditions that must be met before the Effective Date can occur and the Plan can be consummated. These conditions include:

**Conditions to Confirmation**

The Bankruptcy Court shall not be requested to enter an order confirming the Plan unless and until the following conditions have been satisfied or duly waived pursuant to Section IX.C of the Plan:

1.    The Confirmation Order shall be reasonably acceptable in form and substance to the Debtors and the Creditors' Committee.

2.    All Exhibits to the Plan are in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee.

**Conditions to the Effective Date**

The Effective Date shall not occur, and the Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section IX.C of the Plan:

1.    The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order.

2.    The Merger has been consummated and the Newco Charter and Newco Bylaws are in full force and effect and Newco has been vested with the authority to carry out the Post-Effective Date Transactions.

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or part at any time by the Debtors, in consultation with the Creditors' Committee, without an order of the Bankruptcy Court.

**D.      Effect of Nonoccurrence of Conditions to the Effective Date and Amendments to or Revocation of the Plan**

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section IX.C of the Plan, then upon motion by the Debtors or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court.

Subject to the restrictions on plan modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date. The Debtors also reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.

If the Debtors revoke or withdraw the Plan; if confirmation does not occur; or if the Confirmation Order is vacated, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor; (2) prejudice in any manner the rights of any Debtor or any other party in interest; or (3) constitute an admission of any sort by any Debtor or any other party in interest.

**E.      Alternatives to Confirmation and Consummation of the Plan**

If no plan of reorganization under chapter 11 of the Bankruptcy Code can be confirmed, the Bankruptcy Cases may be converted to chapter 7 cases. As previously discussed, in a liquidation case under chapter 7 of the Bankruptcy Code, a trustee or trustees would be appointed to liquidate the remaining assets of each Debtor and distribute proceeds to creditors. The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by chapter 7 of the Bankruptcy Code. The Debtors believe that Confirmation and consummation of the Plan is preferable to a conversion of these chapter 11 cases to chapter 7.

## III.    HISTORY OF THE DEBTORS

**A.      Historical Overview**

Prior to the sale of their business, the Debtors owned and operated the nation's largest family owned, full service department store chain. Established in 1911 and having opened its first department store in 1962, the Debtors operated 49 stores in Pennsylvania, New Jersey, Maryland, New York, and Delaware prior to the Petition Date. The typical Boscov's store served smaller, middle-market communities and relied extensively on years of customer goodwill derived from its family-oriented background and commitment to the communities in which it operates. This, in turn, has led it to be, in most instances, the leading department store retailer in those communities. Following the closing of the sale of the Debtors' assets to BLF on December 4, 2008, BLF has continued to operate the Boscov's retail chain in much the same fashion as the Debtors operated it prior to the Petition Date.

**B.      Events Leading up to the Debtors' Chapter 11 Filings**

Several internal and external factors severely impacted the Debtors, ultimately prompting the near term liquidity pressures that precipitated the Debtors' decision to file their Bankruptcy Cases. The nation overall and the communities in which the Debtors formerly operated have been grappling over the past year with a collapse in the housing market, skyrocketing energy and gasoline prices and steadily increasing food costs leading to a decline in the discretionary spending by consumers upon which the Debtors' business traditionally relied. The Debtors were also a victim of the recent tightening in the credit markets, which negatively impacted the Debtors' operations and cash position. As previously discussed, prior to the Petition Date, extremely tight credit markets hampered the Debtors' ability to increase liquidity to finance the acquisition of inventory and merchandise. Moreover, the Debtors' liquidity woes caused many of their trade vendors to tighten credit terms, require cash on delivery, or, in some cases, require cash in advance, which further eroded their precarious Cash position and impaired their ability to stock adequate merchandise to meet traditional customer demands.

Prior to the Petition Date, the Debtors sought to shore up their financial performance and seek increased liquidity and flexibility in the marketplace. Those efforts included, among other things, attempts to locate alternative sources of financing, discussions and consultations with prospective strategic or financial buyers and the retention of financial advisory and investment banking firms to aid in these efforts. Specifically, in November 2007, the Debtors retained Capstone Advisory Group LLP ("Capstone") to provide financial and strategic advice in connection with a potential restructuring, sale or refinancing. The Debtors extended their engagement with Capstone in July 2008 to provide certain financial, advisory and consulting services in connection with contingency planning and restructuring efforts.

In addition to Capstone, the Debtors also retained Barclays in May 2008 to, among other things, act as the investment banker to the Debtors in connection with a potential sale of the Debtors' business and assets, efforts to raise new capital through potential debt and equity offerings and related matters. To this end, Barclays contacted approximately 25 potential buyers, including both strategic buyers and financial buyers but were unsuccessful in finding an investment significant enough to prevent a bankruptcy filing.

The Debtors also instituted a number of cost cutting measures to trim expenses and boost efficiency in addition to seeking alternative or additional financing to boost liquidity. The Debtors, among other things, reduced headcount at their headquarters, reduced payroll, eliminated holiday and other bonuses, pared back advertising costs and deferred payroll increases.

Notwithstanding the diligent pursuit of out of court alternatives, the Debtors were unable to conclude these efforts within the necessary timeframe. Accordingly, the Debtors filed their Bankruptcy Cases with a view towards engaging in a deliberative and comprehensive strategic planning process while weathering the economic storm buffeting domestic retailers.

## IV.    CAPITAL STRUCTURE AS OF THE PETITION DATE[4]

### A.    General

As of the Petition Date, the Debtors' primary liabilities consisted of: (1) a senior secured credit facility; (2) a junior secured term loan agreement; (3) mortgage debt; (4) unsecured trade debt; and (5) lease obligations. These liabilities are described in more detail below.

### B.    Secured Debt

#### 1.    Prepetition First Lien Credit Facility

Debtors BSCV Department Store, LLC (f/k/a Boscov's Department Store, LLC) and BSCV II, Inc. (f/k/a SDS. Inc.) were borrowers under a certain five-year revolving credit facility dated January 27, 2006 with Bank of America, N.A., as agent, and various lenders thereto (as amended from time to time, the ("Prepetition First Lien Credit Facility"). Each of the other Debtors was a guarantor under the Prepetition First Lien Credit Facility.

Pursuant to its original terms, the Prepetition First Lien Credit Facility included: (a) a last-in, first-out revolving credit facility of up to $340 million; (b) a first-in, last-out revolving credit facility of up to $30 million; and (c) a $50 million sublimit for letters of credit. The Prepetition First Lien Credit Facility was secured by a first-priority lien on substantially all of the Debtors' assets. As of the Petition Date, the principal amount owing under the Prepetition First Lien Credit Facility was approximately $122 million, in addition to approximately $35 million of letters of credit that were outstanding thereunder. As discussed below, these amounts were paid in full with the proceeds of the DIP Credit Agreement. Certain of the Prepetition First Lien Lenders have asserted that they are entitled to certain "prepayment" fees because the Debtors paid in full all amounts due under the Prepetition First Lien Credit Facility with proceeds of the DIP Credit Agreement. The Debtors and Creditors Committee dispute these assertions.

---

[4]    Nothing in this Article IV is an admission as to the proper characterization of the transactions and liabilities discussed herein.

### 2.    Prepetition Second Lien Credit Facility

Debtors BSCV Department Store, LLC (f/k/a Boscov's Department Store, LLC) and BSCV II, Inc. (f/k/a SDS. Inc.) were also borrowers under a term loan credit facility dated March 20, 2008 with Bear Stearns Corporate Lending Inc., as agent, and various lenders thereto (the "Prepetition Second Lien Credit Facility"). Shortly thereafter, Bear Stearns Corporate Lending, Inc. was acquired by J.P. Morgan Chase ("J.P. Morgan") and J.P. Morgan became the agent under the Prepetition Second Lien Credit Facility. Subsequently, GB Merchant Partners LLC ("Gordon Brothers") acquired a one hundred percent (100%) interest in the Prepetition Second Lien Credit Facility and became the agent thereunder. The Prepetition Second Lien Credit Facility was guaranteed by each of the other Debtors as well as by certain non-Debtor real estate entities owned or controlled by members of the Boscov and Lakin families. The Prepetition Second Lien Credit Facility had an original principal amount of $60 million.

As of the Petition Date, the principal amount owing under the Prepetition Second Lien Credit Facility was approximately $38 million. As previously discussed above, all amounts owing under the Prepetition Second Lien Credit Facility were paid in full with a portion of the proceeds of the sale of the Debtors' assets to BLF.

### 3.    The Toms River Mortgage

Prior to the Petition Date, Debtor BSCV II, Inc. (f/k/a SDS. Inc.) acquired ownership of two stores in Wilkes-Barre, Pennsylvania and Toms River, New Jersey. Prior to the closing of the sale to BLF, BSCV II, Inc. was the obligor on an $8 million mortgage on the Toms River store and that mortgage was also guaranteed by BSCV, Inc. (f/k/a Boscov's, Inc.). As part of the sale of the Debtors' assets, BLF assumed all obligations owing with respect to the Toms River mortgage.

### C.    Unsecured Debt

### 1.    Trade Debt

As an operator of a large retail chain operation, the Debtors purchased inventory from over 3,000 vendors located throughout the world. The Debtors purchased merchandise under normal purchase commitments in the ordinary course of business. As of the Petition Date, the Debtors estimate that they owed in excess of $100 million for merchandise and other unsecured obligations for goods and services.

### 2.    Leasehold Obligations

Prior to the Petition Date, the Debtors leased all of their retail department stores, with the exception of the two stores owned by Debtor BSCV II, Inc. (f/k/a SDS. Inc.). BSCV II, Inc. in turn leased these two stores to BSCV Department Store LLC (f/k/a Boscov's Department Store LLC).

### D.    Equity Interests

### 1.    Old Common Stock

The Debtors are a private, family held business and the Old Common Stock was not publicly traded. All of the Old Common Stock is held by members of the Boscov and Lakin families and certain related parties, either in their respective individual capacities or through various trusts.

### 2.    Subsidiary Debtor Equity Interests

BSCV, Inc. (f/k/a Boscov's, Inc.) owns a 100% interest in each of the Debtors except BSCV Department Store, LLC (f/k/a BSCV Department Store, LLC), 99% of which is owned by BSCV, Inc. The remaining 1% is owned by Debtor BSCV PSI, Inc. (f/k/a Boscov's PSI, Inc.).

CHI-1695199v1

## V.    EVENTS DURING THE BANKRUPTCY CASES

### A.    First Day Relief

On the Petition Date, the Debtors filed a number of motions and other pleadings (the "First Day Motions"), the most significant of which are described below.  The First Day Motions were proposed to ensure an orderly transition into chapter 11.

### 1.    Key First Day Motions:

- a motion to pay prepetition wages and other benefits to the Debtors' employees;

- a motion to honor certain prepetition obligations to customers;

- a motion relating to the continued use of the Debtors' existing cash management system, bank accounts, business forms and investment and deposit guidelines;

- motions relating to case administration and the use of Kurtzman Carson Consultants LLC as the Debtors' Claims, Noticing and Balloting Agent;

- a motion to obtain postpetition debtor in possession financing and the use of cash collateral;

- a motion to approve expedited sale procedures and stalking horse bidder protections as well as to approve store closing sales and related relief;

- a motion to establish procedures for determining adequate assurance for the provision of utility services;

- a motion to pay certain prepetition governmental obligations and taxes;

- a motion to continue and maintain insurance policies (including a workers' compensation program); and

- applications to retain professional advisors to the Debtors, including Jones Day, Capstone and Richards, Layton and Finger, LLP.

The First Day Motions were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the United States Trustee and other parties in interest.

### B.    The DIP Credit Agreement

After extensive and arm's length negotiations with certain lenders under the Prepetition First Lien Credit Facility and the Prepetition Second Lien Credit Facility, the Debtors entered into the DIP Credit Agreement on August 4, 2008.  The DIP Credit Agreement was approved on an interim basis by the Bankruptcy Court on August 5, 2008 and the Final DIP Order was entered by the Bankruptcy Court on August 29, 2008.

Pursuant to its terms, the DIP Credit Agreement included: (a) a revolving credit facility of up to $225 million (the "First Lien DIP Revolver"); (b) a "last out revolver advance" of up to $25 million (the "First Lien DIP Last Out Revolver Advance"); and (c) a $50 million sublimit for letters of credit.  The proceeds of the DIP Credit Agreement were used: (a) to refinance on a rolling basis the obligations owing under the Prepetition First Lien Credit Facility and to pay related transaction fees and expenses; (b) for working capital and the general corporate purposes of the Debtors; and (c) for payment of postpetition expenses arising in connection with the Debtors' Bankruptcy Cases.  The amounts outstanding under the DIP Credit Agreement were paid in full in connection with the sale of the Debtors' assets to BLF.

CHI-1695199v1

### C.    Appointment of the Creditors' Committee

On August 12, 2008, the United States Trustee appointed the Creditors' Committee. The current membership of the Creditors' Committee is as follows:

**Creditors' Committee Members:**

**Kellwood Company**
Attn: Edward J. Upbin
600 Kellwood Parkway
Chesterfield, MO 63017
Phone: 314-576-8506

**Jones Apparel Group, Inc.**

Attn: Sharyn Wismann
180 Rittenhouse Circle
Bristol, PA 19007,
Phone: 215-781-5520

**GMAC Commercial Finance LLC**

Attn: Arthur Brown
1290 Avenue of the Americas
New York, NY 10104
Phone: 212-884-7034

**VF Jeanswear (d/b/a Lee Company)**

Attn: Mike Durrant
335 Church Ct.
Greensboro, NC 27401
Phone: 336-519-6212

**HanesBrands, Inc.**

Attn: Russell R. D'Souza
1000 E. Hanes Mill Road
Winston-Salem, NC 27105
Phone: 336-519-6212

**Philadelphia Newspapers, Inc.**

Attn: Scott D. Baker, Esq.
400 N. Broad Street
Philadelphia, PA 19130
Phone: 215-854-5969

**Phillips-Van Heusen**

Attn: Warren C. Gerber, Jr.
1001 Frontier Road
Bridgewater, NJ 08807
Phone: 908-698-6345

**Counsel:**

**Cooley Godward Kronish LLP**
Attn: Larry Gottlieb, Esq.
The Grace Building
1114 Avenue of the Americas
New York, NY 10036-7798
Phone: 212-479-6000

And

**Potter Anderson & Corroon LLP**

Attn: Steven Yoder, Esq.
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801
Phone: 302-984-6000

**Financial Advisors:**

**Traxi LLC**

Attn: Anthony J. Pacchia
120 West 45th Street
Tower 45 - 6th Floor
New York, NY 10036
Phone: 212-810-1927

### D.    Liquidation of Underperforming Stores

In the summer of 2008, in anticipation of a bankruptcy filing, the Debtors' management, with the assistance of their financial advisors, identified ten store locations (collectively, the "Closing Stores") as underperforming and determined that they should conduct store closing sales at these locations as soon as possible after the Petition Date (the "Store Closing Sales"). The Debtors believed that the proposed Store Closing Sales would maximize recoveries to their Estates with respect to the assets located at the Closing Stores and allow the Debtors to retire immediately a

- 13 -

portion of their secured debt. Further, the proposed Store Closing Sales would dramatically reduce, and ultimately eliminate, the administrative costs associated with these underperforming Closing Stores.

In connection with their efforts to liquidate the Closing Stores, the Debtors contacted five national liquidation firms (the "Liquidation Firms") that specialize in, among other things, the large scale liquidation of assets to liquidate the merchandise (the "Merchandise") located at the Closing Stores. After receiving a signed confidentiality agreement from several Liquidation Firms, the Debtors provided these firms with substantial due diligence materials. Soon thereafter, the Debtors received three initial bids. Because the bids received by the Debtors were in different formats, the Debtors decided to circulate a standard agreement to each of the initial bidders and solicit additional bids based on the standard agreement. After circulating the standard form agreement, the Debtors received a bid from Gordon Brothers Retail Partners, LLC ("Gordon Brothers LLC") that, in the Debtors' view, presented the best offer. Soon after selecting Gordon Brothers LLC as the stalking horse bidder, the Debtors negotiated and entered into a stalking horse agreement (the "Stalking Horse Agreement") with Gordon Brothers LLC.

Under the Stalking Horse Agreement, the Debtors were to receive 103% of the Cost Value (as defined in the Stalking Horse Agreement) of the Merchandise, which the Debtors valued at no lower than $34 million. The Stalking Horse Agreement further provided that the Debtors would receive additional consideration if the proceeds from the Store Closing Sales exceeded certain specified amounts. Finally, the Stalking Horse Agreement provided that Gordon Brothers LLC would assume financial responsibility for the vast majority of the expenses incurred in conducting the Store Closing Sales, including certain payroll and occupancy related expenses.

Pursuant to a Bankruptcy Court order dated August 5, 2008 (the "Store Closing Order"), the Bankruptcy Court authorized the Debtors to execute the Stalking Horse Agreement, subject to higher and better offers, and provided for an auction to be held on August 12, 2008 (the "Store Closing Auction") for the right to liquidate the Closing Stores. The Store Closing Auction was extremely competitive with over 8 nationally known liquidation firms submitting competitive bids. At the conclusion of the Store Closing Auction, a consortium of Gordon Brothers LLC and Hilco Merchant Resources ("Hilco") submitted the winning bid, agreeing to purchase the Merchandise for a Guaranteed Amount of 108.3% of the Cost Value of the Merchandise. On August 15, 2008, the Bankruptcy Court entered an order (the "Store Liquidation Order") approving the Gordon Brothers LLC-Hilco Bid and approving the Debtors' entry into an agency agreement on substantially the same terms as the Stalking Horse Agreement.

On August 17, 2008, Hilco and Gordon Brothers LLC commenced the Store Closing Sales, which concluded in October 2008, at which time each of the real property leases associated with the Closing Stores was rejected.

E.    **Sale of Substantially All of the Debtors' Assets**

Despite the positive results netted from the Store Closing Sales, the Debtors' business continued to require additional capital in order to achieve long-term viability. The downward trend in retail performance and the constrictions in the capital markets greatly limited the Debtors' ability to acquire goods in anticipation of the coming holiday season. Accordingly, Barclays embarked on a process to find a buyer or investor as part of the Debtors' long-term chapter 11 strategy. As part of that process, it became apparent that any potential buyer or investor likely would want to close a transaction with the Debtors prior to the onset of the holiday season, the Debtors' most lucrative sales season of the year. Consequently, the Debtors moved with great urgency to explore a going concern sale transaction that could close near the end of October 2008 or the beginning of November 2008.

On September 30, 2008, the Debtors executed the Regio APA, which contemplated the sale of substantially all of the Debtors' assets as a going concern. In early October 2008, the Bankruptcy Court approved an expedited sale process in connection with the Regio APA, which contemplated a bidding deadline of October 15, 2008 for any competing qualified bids, an auction, if necessary, on October 20, 2008, and a sale hearing to commence on October 21, 2008.

On the sale bidding deadline, the Debtors received only one other bid, from BLF. October 15, 2008 was also the deadline set forth in the Regio APA to provide the Debtors with documentation demonstrating that Regio had the requisite financing and equity commitments to close its purchase of the Debtors within the timeframe set

- 14 -

forth in the Regio APA. As of October 15, 2008, the documentation that Regio had submitted to the Debtors did not, in the Debtors' view, demonstrate that Regio had the requisite financing to close the transaction, and at that time, Regio proposed to the Debtors that the closing of any sale be deferred until January 7, 2009. Versa and Regio dispute the Debtors' contention and assert that Regio did provide documentation evidencing its financing and equity commitments provided for under the Regio APA and that Regio would have likely closed the sale at an earlier date if given the opportunity. The Debtors believe that Versa's assertions have no merit.

From the Debtors' perspective, a January 2009 closing presented several risks, including running afoul of their commitments to the Debtors' postpetition lenders, who had insisted that any sale close prior to December 2008. Nevertheless, the Debtors and Regio agreed to extend many of the sale-related deadlines in an effort to secure a deal. At the same time, the Debtors continued negotiations with BLF regarding a potential sale transaction. As negotiations between the Debtors and their potential suitors progressed, it became increasingly clear to the Debtors, the Creditors' Committee and the DIP Lenders that a sale transaction with BLF would have several advantages over a transaction with Regio, not the least of which was that BLF could finance a transaction to close on the timeframe required by the DIP Lenders. Consequently, on October 31, 2008, following a meeting of a special committee of the Debtors' board of directors, and with the consent of the Creditors' Committee, the Debtors terminated the Regio APA pursuant to section 4.4(e) thereof.

On November 3, 2008, with the support of the Creditors' Committee, the Debtors executed the BLF APA, which provided for the sale of substantially all of the Debtors' assets to BLF, and the assumption and assignment of certain contracts and leases in connection therewith. On November 21, 2008, the Bankruptcy Court approved the sale to BLF, as well as the assumption and assignment to BLF of many of the Debtors' contracts and leases. On December 4, 2008, the Debtors closed the sale with BLF, the proceeds from which have been used to pay the Debtors' secured bank debt in full. The remainder of the sale proceeds will be used to fund distributions under the Plan and to pay administrative costs.

### F.    Shareholder Settlement

Since the inception of the Bankruptcy Cases, the Creditors' Committee, in furtherance of its fiduciary duties, and with the full cooperation of the Debtors, has engaged in a process of gathering and reviewing general due diligence with respect to the Debtors' assets and liabilities, as well as the validity, extent and priority of the Debtors' prepetition credit facilities. In the process of this review, the Creditors' Committee was particularly focused on any and all transactions that involved the transfer of the Debtors' assets to insiders of the company in the years immediately preceding the Petition Date. Based on its review of the due diligence, the Creditors' Committee identified two transactions that, in its opinion, required heightened scrutiny — a recapitalization of the Debtors in 2006 (the "2006 Recapitalization") pursuant to which the Debtors sold significant assets and redeemed equity interests held by the Shareholders for approximately $185 million; and a transaction in 2008 pursuant to which landlord entities controlled by former Shareholders contributed $20 million to the Debtors in exchange for, among other things, increased rent payments by the Debtors to such entities for the remaining lease terms (the "2008 Transaction" and, together with the 2006 Recapitalization, the "Shareholder Transactions").

Based on its review of the relevant materials, the Creditors' Committee believed that there was documentary evidence that could give rise to a colorable claim against the Shareholders relative to the Shareholder Transactions, and in particular, that certain transfers made by the Debtors to the Shareholders could be avoidable as constructively fraudulent transfers under applicable law. The Shareholders, in turn, asserted that several valid defenses to any such claims existed, including that the Debtors were solvent during the Shareholder Transactions; that the Debtors received reasonably equivalent value in exchange for the transfers; and that binding Third Circuit precedent with respect to the so-called "settlement payment defense" pursuant to section 546(e) of the Bankruptcy Code would bar the prosecution of any claims related to the Shareholder Transactions.

Ultimately, the parties agreed that a consensual resolution would provide the maximum benefit to the Debtors' Estates and their creditors and enable the Debtors' Estates and the Shareholders to avoid considerable litigation expenses and delay. Accordingly, in connection with the negotiations of the sale transaction with BLF, the Creditors' Committee and counsel for the Shareholders engaged in arm's length discussions about the terms of a potential settlement. These efforts culminated with the Shareholder Settlement, which provides, in relevant part, the following resolution:

- 15 -

- General Releases. The Debtors and the Creditors' Committee released the Shareholders, related parties, agents, or transferees, and any of the Debtors' current or former shareholders, officers, directors, or employees from any claims, or liabilities, including without limitation, any claims or liabilities relating to the Shareholder Transactions, and any avoidance or similar actions (whether arising under the Bankruptcy Code, or otherwise) relating to the Shareholder Transactions.

- Consideration. At the closing of the BLF sale transaction the following amounts were paid:

  — The Shareholders paid to the Debtors $8 million in immediately available funds.

  — BLF furnished to the Debtors a duly executed copy of the Purchaser Note in the amount of $4 million.

By a joint motion between the Debtors and the Creditors' Committee dated November 12, 2008, the Debtors sought Bankruptcy Court approval of the Shareholder Settlement. The Bankruptcy Court approved the Shareholder Settlement in all respects on November 21, 2008 in connection with the BLF sale transaction.

### G.    Bar Date Motion

By motion dated December 2, 2008 (the "Bar Date Motion"), the Debtors sought the Bankruptcy Court's authorization to establish certain bar dates for filing proofs of claim against the Debtors' Estates and seeking allowance of administrative expense claims. By order dated December 19, 2008 (the "Bar Date Order"), the Bankruptcy Court granted the Bar Date Motion, establishing March 2, 2009 at 5:00 p.m. (PT) as the bar date both for (i) filing proofs of claim against the Debtors' Estates (the "General Claim Bar Date"), and (ii) filing applications for allowance of administrative expense claims arising between August 4, 2008 through and including December 4, 2008 (the "Administrative Claim Bar Date"). On December 29, 2008, the Debtors served, among other things, notice of the General Claims Bar Date and the Administrative Claim Bar Date in accordance with the Bar Date Order.

### H.    Versa Motion for Payment of Breakup Fee

On December 24, 2008, Versa filed with the Bankruptcy Court a motion (the "Breakup Fee Motion") for the allowance and payment of a super-priority claim in an amount of $4 million arising under the Regio APA as a result of the termination of the Regio APA and the Debtors' subsequent closing of the sale transaction with BLF. Versa argues that it is entitled to payment of a breakup fee because the Debtors' pursuit of a sale with BLF triggered an automatic right of payment of a breakup fee under section 4.4(p) of the Regio APA. Alternatively, Versa argues that it is entitled to a $4 million administrative expense claim pursuant to section 503(b) of the Bankruptcy Code because its role as a stalking horse buyer was necessary to preserve and enhance the value of the Debtors' estate.

On January 14, 2009, the Debtors and the Creditors' Committee filed their joint objection to the Breakup Fee Motion, in which they adamantly disputed the assertions raised by Versa in the Breakup Fee Motion. Versa filed a reply in support of the Breakup Fee Motion on January 16, 2009, in which it contested the Debtors' assertions raised in their joint objection. The parties currently are engaged in discovery pursuant to a scheduling order entered by the Bankruptcy Court on February 27, 2009. A final hearing on the Breakup Fee Motion is scheduled for May 12, 2009. The Debtors and the Creditors' Committee contend that the Breakup Fee Motion is without merit. Versa disagrees and believes it is entitled to the relief sought in the Breakup Fee Motion. To the extent the Bankruptcy Court were to award Versa a breakup fee or other payment, the payment of such amounts could significantly reduce distributions to holders of Class 4 Claims under the Plan.

## VI.    MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Continued Corporate Existence and Vesting of Assets in Newco

On or immediately after the Effective Date, other than the transactions effectuated by the Merger, all of the Debtors will be fully liquidated and dissolved except for BSCV, Inc. (f/k/a Boscov's, Inc.) ("Old Boscov's"), which will be merged with and into Newco, with Newco as the surviving corporation (the "Merger"). All assets of each dissolved Debtor's Estate will be transferred to, and vest in, Newco as successor to Old Boscov's, free and clear of

any and all Claims, liens, charges, other encumbrances, Interests and other interests to effectuate distributions to creditors under the Plan. Except as otherwise provided in the Plan, (1) Newco, as successor to Old Boscov's, will continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law; and (2) on the Effective Date and after the effectiveness of the Merger under applicable state law, all property of Old Boscov's, unless used to satisfy Claims under the Plan to be paid under the Plan on the Effective Date, will vest in Newco free and clear of any and all Claims, liens, charges, other encumbrances, Interests and other interests.

Prior to the Merger, pursuant to the Plan, all of the outstanding shares of Old Boscov's common stock will be cancelled as worthless stock and a single new share of common stock of Old Boscov's will be issued to the Responsible Person (the "Share Cancellation and Reissuance"). In the Merger, each outstanding share of common stock of Old Boscov's will be cancelled in exchange for the right to receive one share of Newco common stock.

The cancellation of all of the outstanding shares of Old Boscov's common stock and the issuance of a single share of Old Common Stock (which will be subsequently cancelled by the Merger) to the Responsible Person as part of the Share Cancellation and Reissuance pursuant to the Plan is exempt from registration under the Securities Act of 1933, and in any event would also be exempt pursuant to Section 4(2) of the Securities Act of 1933. In addition, the issuance of one share of Newco Common Stock to the Responsible Person after the Merger is exempt from registration pursuant to Section 4(2) of the Securities Act of 1933.

Because Newco will not have any securities outstanding after the Share Cancellation and Reissuance and the Merger other than the share of Newco common stock issued to the Responsible Person, Newco will not be subject to the periodic reporting requirements under Section 13(a) or 15(d) of the Securities Exchange Act of 1934.

**B.      Other Means for Implementation of the Plan**

**1.      Post-Effective Date Transactions**

Prior to the Confirmation Date, the Debtors disposed of substantially all of their material assets pursuant to the Sale and Sale Order. Upon the effectiveness of the Plan, Newco will wind-down the Estates and dispose of any remaining assets pursuant to the Plan and the distribution scheme contained in the Plan.

After the Effective Date, Newco may enter into such Post-Effective Date Transactions and may take such actions as it may determine to be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, the terms of the Plan. Notwithstanding the foregoing and regardless of whether any Post-Effective Date Transactions have yet been taken with respect to a particular Debtor, upon the transfer of the Debtors' assets to Newco under the Plan, the Debtors will be deemed dissolved and their business operations withdrawn for all purposes without any necessity of filing any document, taking any further action or making any payment to any governmental authority in connection therewith.

The actions to effect the Post-Effective Date Transactions described above may include: (i) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution, containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, as well as other terms to which these entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms as these entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar instruments with the applicable governmental authorities; and (iv) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Post-Effective Date Transactions.

The Post-Effective Date Transactions will result in all of the respective assets, properties, rights, liabilities, duties and obligations of each Debtor, as of the Effective Date, vesting in Newco. Newco will perform all obligations pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against any such Debtor, except as provided in the Plan.

### 2.    Corporate Governance and Directors and Officers

As of the Effective Date, and pursuant to the Plan, the Newco Charter and Newco Bylaws will be substantially in the forms set forth in Exhibits I and II to the Plan. The Newco Charter and Newco Bylaws will: (a) prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code; and (b) set forth the duties and responsibilities of the Responsible Person. On or prior to the Effective Date, Newco will file the Newco Charter with the Secretary of State of the State of Delaware in accordance with the applicable corporate law of such state. On or prior to the Effective Date, Newco and Old Boscov's will file a Certificate of Merger with the Secretary of State of the State of Delaware and Articles of Merger with the Secretary of State of the State of Pennsylvania in accordance with the applicable corporate laws of such states in order to effect the Merger. The Certificate of Merger and Articles of Merger will each provide that the Newco Charter and Newco Bylaws will survive the Merger as the charter and bylaws of Newco. After the Merger, Newco may amend and restate its Certificate of Incorporation or bylaws as permitted by applicable state law, subject to the terms and conditions of such constituent documents.

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, from and after the Effective Date: (a) the initial officer of Newco will be the Responsible Person identified on Exhibit I to the Plan and (b) the initial board of directors of Newco shall consist of the Responsible Person. The Responsible Person will serve from and after the Effective Date (both before and after the effectiveness of the Merger) until the earlier of (a) his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the Newco Charter, Newco Bylaws and state law; or (b) the closing of the Bankruptcy Cases. The initial Responsible Person identified on Exhibit I to the Plan will be selected by the Creditors' Committee and any subsequent Responsible Person (if any) will be selected by the Oversight Committee in accordance with the terms of the Newco Charter, Newco Bylaws and applicable state law.

### 3.    Workers' Compensation Programs; No Change in Control

From and after the Effective Date, with respect to employees retained by Newco, as successor to Old Boscov's, if any, to effect the Plan, Newco will continue to administer and pay all valid claims for benefits and liabilities arising under the Debtors' workers' compensation programs for which Newco is responsible under applicable state workers' compensation law, regardless of when the applicable injuries were incurred, in accordance with the Debtors' prepetition practices and procedures and governing state workers' compensation law. Newco expressly reserves the right to challenge the validity of any claim for benefits or liabilities arising under any workers' compensation program.

The consummation of the Plan, including the Merger and the Share Cancellation and Reissuance, the implementation of the Post-Effective Date Transactions or assumption and assignment of any Executory Contract or Unexpired Lease to Newco, as successor to Old Boscov's, is not intended to, and will not, constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, Executory Contract or Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a Debtor is a party.

### 4.    Termination of All Employee Benefit Plans and Workers' Compensation Benefits

Except as otherwise determined by Newco, all existing employee benefit plans and workers' compensation benefits not previously expired or terminated by the Debtors will be terminated on or before the Effective Date.

### 5.    Compliance with Section 1114 of the Bankruptcy Code

Notwithstanding Section IV.B.4 of the Plan, from and after the Effective Date, Newco, as successor to Old Boscov's, shall be obligated to pay retiree benefits (as defined in section 1114(a) of the Bankruptcy Code), if any, in accordance with the terms of any of the Debtors' retiree benefit plans or other agreements governing the payment of

such benefits, subject to any rights to amend, modify or terminate such benefits under the terms of the applicable retiree benefits plan, other agreement or applicable nonbankruptcy law.

### 6.      Corporate Action Deemed as of the Effective Date; Duties and Powers of Newco

With respect to the Post-Effective Date Transactions; the adoption of the Newco Charter and Newco Bylaws; the initial selection of the Responsible Person; the distribution of Cash pursuant to the Plan; the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; the Share Cancellation and Reissuance; the Merger; and the other matters provided for under the Plan involving the corporate structure of the Debtors and Newco or corporate action to be taken by or required of a Debtor or Newco will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the stockholders or directors of the Debtors or Newco.

On and after the Effective Date, Newco, as successor to Old Boscov's, will be responsible for, and have the authority to: resolve all Disputed Claims, make all distributions to holders of Allowed Claims in accordance with the terms of the Plan and otherwise implement the Plan and administer the Debtors' Estates.  Subject to and to the extent set forth in the Plan, the Confirmation Order, or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), Newco will be empowered to: (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the Plan; (ii) accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the Distributable Cash in accordance with the Plan; (iii) sell, liquidate, transfer, distribute or otherwise dispose of any assets or any part thereof or any interest therein pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan; (iv) calculate and make distributions to holders of Allowed Claims pursuant to the procedures for allowing Claims and making distributions as provided in the Plan; (v) comply with the Plan and exercise its rights in accordance with the Newco Charter and Newco Bylaws; (vi) review, reconcile, settle or object to Claims and resolve such objections as set forth in the Plan; (vii) employ professionals as necessary to discharge its duties and obligations; (viii) file appropriate Tax returns and other reports on behalf of the Debtors and pay Taxes or other obligations owed by the Debtors; (ix) exercise such other powers as may be vested in Newco or as deemed by such person to be necessary and proper to implement the provisions of the Plan; (x) take such actions as are necessary or appropriate to close or dismiss any or all of the Bankruptcy Cases; and (xi) dissolve Newco.

### C.      Administration of Newco

#### 1.      Recourse Solely to Distributable Cash

All Claims against the Debtors will be deemed fully satisfied, waived and released in exchange for the treatment of such Claims under the Plan, and holders of Allowed Claims against any Debtor will have recourse solely to the applicable Distributable Cash for the payment of their Allowed Claims in accordance with the terms of the Plan.

#### 2.      Newco Expense Reserve Account

On the Effective Date, Newco shall establish the Newco Expense Reserve Account to fund all Newco Expenses in an aggregate amount to be agreed upon by the Debtors and the Committee.  To the extent the funds deposited in the Newco Expense Reserve Account are not sufficient to pay all Newco Expenses, the Responsible Person, in consultation with the Oversight Committee, shall have the authority to transfer funds from the Disputed Unsecured Claims Reserve Account to the Newco Expense Reserve Account to pay all such Newco Expenses.

#### 3.      Reports to be Filed by the Responsible Person

The Responsible Person will File with the Bankruptcy Court quarterly reports regarding the administration of property vested in Newco pursuant to the Plan, distributions made, and other matters relating to the implementation of the Plan.

4.    **Purchaser Note**

On the Effective Date, the Purchaser Note will be fully assignable to Newco. Newco, as successor to Old Boscov's, will receive and distribute in accordance with the Plan all payments required to be made by BLF under the Purchaser Note and will have the authority to enforce the terms of the Purchaser Note in consultation with the Oversight Committee. Newco will be obligated to pay out to holders of Allowed Claims all proceeds received from the Purchaser Note in excess of expenses.

**D.    Effect of Confirmation of the Plan**

1.    **Sale and Settlement of Causes of Action by the Debtors**

Pursuant to the Sale and Settlement Orders, respectively, the Debtors have resolved substantially all Causes of Action belonging to the Estates. Notwithstanding the immediate preceding sentence, in accordance with section 1123(b) of the Bankruptcy Code, Newco will retain all Retained Causes of Action that the Debtors or the Estates may hold against any entity, which were not resolved pursuant to the Sale Order, the Settlement Order or any other order of the Bankruptcy Court, including, but not limited to, those Retained Causes of Action listed on Exhibit IV to the Plan. In consultation with the Oversight Committee, Newco will have authority to prosecute or settle all such Retained Causes of Action for the benefit of the Estates.

2.    **Comprehensive Settlement of Claims and Controversies**

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, Newco, the Estates and their respective property and Claim and Interest holders and is fair, equitable and reasonable.

**E.    Special Provisions Regarding Insured Claims**

Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from the proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing herein, or in Section IV.E of the Plan shall constitute a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' insurance carriers.

**F.    Cancellation of Old Common Stock and Subsidiary Debtor Equity Interests**

The Old Common Stock and Subsidiary Debtor Equity Interests will be deemed cancelled and of no further force and effect upon the Effective Date. The holders of or parties to such canceled securities and other documentation will have no rights arising from or relating to such securities and other documentation or the cancellation thereof. As of the close of business on the Distribution Record Date, the transfer registers for the Old Common Stock and the Subsidiary Debtor Equity Interests, respectively, will be closed. Thereafter, the only outstanding equity of the Debtors shall be the shares of common stock that will be issued to the Responsible Person, which will be cancelled and replaced with outstanding shares of Newco common stock upon the effectiveness of the Merger.

**G.    Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and consistent with the treatment provided for Claims and Interests in Article III, all mortgages, deeds of trust, liens or other security

- 20 -

interests against the property of any Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any Collateral thereunder, will revert to Newco and its successors and assigns. As of the Effective Date, Newco will be authorized but not required to execute and file on behalf of creditors Form UCC-3 Termination Statements or such other forms as may be necessary or appropriate to implement the provisions of Section IV.G of the Plan.

### H.    Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Responsible Person will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. The Responsible Person will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146(c) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax or similar Tax: (1) the issuance, transfer or exchange of Newco Common Stock (2) any Post-Effective Date Transaction; or (3) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

## VII.    RISK FACTORS

Prior to voting on the Plan, each holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### A.    Risk of Non-Confirmation of the Plan

Even if all impaired Classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. As set forth above, section 1129 of the Bankruptcy Code sets forth the requirements for plan confirmation. Although the Debtors believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.    Nonconsensual Confirmation

Pursuant to the "cramdown" provisions of section 1129 of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if at least one impaired Class has accepted the Plan and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired Class.

The Debtors reserve the right to modify the terms of the Plan as necessary for confirmation without the acceptance of all impaired Classes. Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided for in the Plan.

### C.    Delays of Confirmation and/or Effective Date

Any delay in confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Claims. These or any other negative effects of delays in confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court.

### D.    Allowance of Claims

The estimates of Allowed Claims in this Disclosure Statement are based on the Debtors' review of their books and records. Because the General Claim Bar Date and the Administrative Claim Bar Date has not yet passed, the Debtors do not know for certain the magnitude and priority of the total Claims filed. In addition, the Debtors have not settled any Claims nor prosecuted any Claims objections. Upon the passage of all applicable claims bar dates, the completion of further analyses of the proofs of Claim, the completion of Claims litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in these Bankruptcy Cases may differ

- 21 -

from the Debtors' estimates, and such difference could be material. With respect to Class 4 in particular, the actual ultimate aggregate amount of Allowed General Unsecured Claims in such Class may differ significantly from the estimates set forth in this Disclosure Statement. Accordingly, the amount of Pro Rata distributions of Distributable Cash that may be received by a particular holder of an Allowed General Unsecured Claim in Class 4 may be adversely or favorably affected by the aggregate amount of Claims ultimately allowed in such Class.

### E.    Priority Treatment of Certain Vendor Claims

Pursuant to section 503(b)(9) of the Bankruptcy Code, sellers of goods to the Debtors within twenty days of the Petition Date are entitled to an Administrative Claim for goods delivered to, but not paid for by, the Debtors. As noted above, pursuant to the BLF APA, BLF is obligated to pay 503(b)(9) Claims asserted against the Debtors' Estates up to $10 million. To date, BLF has paid to the Debtors' Estates approximately $7.9 million in respect of 503(b)(9) Claims, the expected maximum allowed amount of such claims. To the extent such Claims exceed the $10 million cap set forth in the BLF APA, the Debtors will become liable for paying any such excess 503(b)(9) Claims. Additionally, to the extent 503(b)(9) Claims exceed $7.9 million and BLF is unable to satisfy its obligations under the BLF APA to reimburse the Estates for such claims up to the $10 million cap, the Debtors will become liable to pay such Claims. In either circumstance, the amount of Distributable Cash available for holders of Allowed General Unsecured Claims in Class 4 may be less than the Debtors' current estimates.

### F.    Dependence Upon BLF

After the sale of the Debtors' assets to BLF, the Debtors were left with one employee, which situation is expected to remain after the Effective Date of the Plan in the form of the Responsible Person. As such, the Estates are dependent upon BLF personnel for, among other things, access to the Debtors' books and records in order to assess and process claims and for other related matters, and for other transition services that the Debtors require of BLF. The Debtors believe that the transition services agreement provisions of the BLF APA require BLF to provide such access to books and records and transition services that the Debtors require to properly wind-down their Estates. The Debtors are required to reimburse BLF only for the out-of-pocket costs associated with such services. However, to the extent that BLF becomes unable or refuses to adhere to the terms of the BLF APA with respect to these matters, the Debtors' Estates will be negatively impacted and it is likely that the Debtors will incur additional, unexpected costs and expenses to wind-down their Estates, which costs and expenses may be material.

In addition, BLF's ability and willingness to make payments under the Purchaser Note will affect distributions to creditors under the Plan. Because of the contingent nature of the payments under the Purchaser Note and the long time period prior to the Purchaser's obligation to make the last, non-contingent payment under such note, the estimates for distributions to creditors in Class 4 under the Plan do not include any recovery on account of the Purchaser Note.

### G.    Expected Tax Refunds

The Debtors are anticipating receipt of approximately $7.0 million in tax refunds during calendar year 2009. The Debtors have included the expected receipt of such refunds in their projected recoveries for holders of claims in Class 4 under the Plan. Should such tax refunds not materialize or be significantly less than expected, distributions to holders of claims in Class 4 will be adversely affected in a material manner.

### H.    Versa Breakup Fee Claim

Although the Debtors believe that Versa's claim for payment of a breakup fee in the Breakup Fee Motion is without merit, should the Bankruptcy Court rule in Versa's favor, Versa's Claim against the Debtors would be an Administrative Claim, the payment of which could significantly reduce recoveries to holders of Allowed General Unsecured Claims in Class 4.

## VIII.    DISTRIBUTIONS UNDER THE PLAN

### A.    Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in Article VI of the Plan, distributions of Cash to be made on the Effective Date to holders of Claims as provided by Article III or Article V of the Plan that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable, but in any event no later than: (1) 60 days after the Effective Date; or (2) with respect to any particular Claim, such later date as specified in the Plan. Distributions on account of Claims that become Allowed Claims after the Effective Date shall be made pursuant to Section VI.D.2.c of the Plan.

**B.    Method of Distributions to Holders of Claims**

The Responsible Person, on behalf of Newco, will make all distributions of Distributable Cash required under the Plan. At the sole discretion of the Oversight Committee, the Responsible Person may serve with bond or similar financial instrument, and the Responsible Person, in consultation with the Oversight Committee,  may employ or contract with other entities to assist it making distributions required by the Plan.

**C.    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.    Delivery of Distributions**

Distributions to holders of Allowed Claims will be made by the Responsible Person, on behalf of Newco, on each Distribution Date: (a) at the addresses set forth on the respective proofs of Claim Filed by holders of such Claims; (b) at the addresses set forth in any written certification of address change delivered to the Responsible Person; (c) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Responsible Person has not received a written notice of a change of address; or (d) if clauses (a), (b) and (c) are not applicable, at the last address directed by such holder after such Claim becomes an Allowed Claim.

**2.    Undeliverable Distributions Held by Newco**

**a.    Holding of Undeliverable Distributions**

Subject to Section VI.C.2.c of the Plan, distributions returned to Newco or otherwise undeliverable shall remain in the possession of Newco pursuant to Section VI.C.2.a of the Plan until such time as a distribution becomes deliverable. Subject to Section VI.C.2.c of the Plan, undeliverable Cash shall be held by Newco for the benefit of the potential claimants of such Distributable Cash.  Newco will invest such Cash in a manner consistent with the Debtors' previous investment and deposit guidelines.

**b.    After Distributions Become Deliverable**

On each Distribution Date, the Responsible Person, on behalf of Newco, will make all distributions that become deliverable to holders of Allowed Claims since the preceding Distribution Date. Each such distribution will include, to the extent applicable, a Pro Rata share of the Cash Investment Yield from the investment of any undeliverable Cash from the date that such distribution would have first been due had it then been deliverable to the date that such distribution becomes deliverable.

**c.    Failure to Claim Undeliverable Distributions**

Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an undeliverable distribution to be made by Newco within one year after the later of (i) the Effective Date and (ii) the last date on which a distribution was deliverable to such holder will have its claim for such undeliverable distribution discharged and will be forever barred from asserting any such claim against Newco or its property.  In such cases, unclaimed Distributable Cash will be distributed by Newco to all other known holders of Allowed Class 4 Claims on a Pro Rata basis. Nothing contained in the Plan will require Newco to attempt to locate any holder of an Allowed Claim.

**D.    Timing and Calculation of Amounts to Be Distributed**

**1.    Allowed Claims**

- 23 -

Subject to Section VI.A of the Plan and the treatment of Claims described in Article III of the Plan, on or after the Effective Date, each holder of an Allowed Claim (other than holders of Claims in Class 4) will receive the full amount of the distributions that the Plan provides for Allowed Claims. Subject to Section III.A of the Plan on each Distribution Date, distributions also will be made to holders of Disputed Claims that were allowed since the preceding Distribution Date. Such distributions also will be in the full amount that the Plan provides for Allowed Claims.

### 2.    Distributions to Holders of Allowed Claims in Class 4

#### a.    Distributions of Distributable Cash

Pursuant to the Plan and the priority scheme contained in the Bankruptcy Code, the Responsible Person, on each Distribution Date, will, on behalf of Newco, distribute to each holder of an Allowed Claim in Class 4 its Pro Rata share of the Distributable Cash.

#### b.    Creation and Funding of Disputed Unsecured Claims Reserve Account

On and after the Effective Date, after the creation and funding of the Newco Expense Reserve Account pursuant to Section IV.C.4 of the Plan, the Disputed Unsecured Claims Reserve Account will be funded by the transfer of Disputed Unsecured Claims Reserve Cash from Newco for the benefit of holders of Disputed Claims that become Allowed Claims in Class 4. For the purpose of calculating the amount of Disputed Unsecured Claims Reserve Cash to be contributed to the Disputed Unsecured Claims Reserve Account, all Disputed Claims in Class 4 will be treated (solely for purposes of funding the Disputed Unsecured Claims Reserve Account) as Allowed Claims in the Face Amount of such Claims or as otherwise agreed to by the holder of such Disputed Unsecured Claim and the applicable Debtor or Newco, or as determined by further order of the Bankruptcy Court. In addition, Disputed Claims rendered duplicative as a result of the consolidation of the Debtors pursuant to Section VIII.A will only be counted once for purposes of funding the Disputed Unsecured Claims Reserve Account. Newco will invest any Cash held in the Disputed Unsecured Claims Reserve Account in a manner consistent with the Debtors' prior investment and deposit guidelines.

#### c.    Distributions of Disputed Unsecured Claims Reserve Cash

On each Distribution Date, a holder of an Allowed Claim in Class 4 that ceased being a Disputed Claim subsequent to the most recent prior Distribution Date will receive a Catch-Up Distribution. Subject to Section VI.D.2.c of the Plan, if, prior to a Distribution Date, a Disputed Claim in Class 4 is Allowed in an amount that is less than the Face Amount of such Disputed Claim, an amount of Disputed Unsecured Claims Reserve Cash equal to the difference between the amount of Cash distributable on the Allowed and Face Amount of such Disputed Claim will be distributed Pro Rata to the holders of Allowed Claims in Class 4 on the next Distribution Date.

#### d.    Record Dates for Distributions; Postponement of Distribution Dates

Newco may establish a record date prior to each Distribution Date such that only Claims Allowed as of the record date will participate in such distribution. Notwithstanding the foregoing, the Responsible Person, on behalf of Newco, reserves the right, to the extent it determines a distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

### 3.    De Minimis Distributions

Newco will not distribute Cash to the holder of an Allowed Claim in an impaired Class if the amount of Cash to be distributed on account of such Claim is less than $25. Any holder of an Allowed Claim on account of which the amount of Cash to be distributed is less than $25 will have its claim for such distribution discharged and will be forever barred from asserting any such claim against Newco or its property. Any Cash not distributed pursuant to Section VI.D.3 of the Plan will be the property of Newco, free of any restrictions thereon.

### 4.    Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, Newco will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. Newco will be authorized to take any actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

Notwithstanding any other provision of the Plan, each person or entity receiving a distribution of Cash or other property pursuant to the Plan will have sole and exclusive responsibility for the payment of any Tax obligations imposed on it by any governmental unit on account of such distribution.

E.    **Distribution Record Date**

1.    **Newco will have no obligation to, and shall not, recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the Distribution Record Date.**

2.    **Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.**

F.    **Means of Cash Payments**

Except as otherwise specified in the Plan, Cash payments made pursuant to the Plan will be in U.S. currency by checks drawn on a domestic bank selected by Newco or, at the option of Newco, by wire transfer from a domestic bank; *provided, however*, that Cash payments to foreign holders of Allowed Claims may be made, at the option of Newco, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

G.    **Setoffs**

Except with respect to (1) claims of a Debtor or Newco released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan; or (2) the Chapter 5 Claims purchased by the Purchaser pursuant to section 2.1(b)(xiii) of the Sale Agreement, Newco may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of the Claim (before any distribution is made on account of the Claim) the claims, rights and Retained Causes of Action of any nature that the applicable Debtor or Newco may hold against the holder of the Allowed Claim; *provided, however*, that neither the failure to effect a setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the applicable Debtor or Newco of any claims, rights and Causes of Action that the Debtor or Newco may possess against the Claim holder.

- 25 -

## IX.    INJUNCTION AND SUBORDINATION RIGHTS

The Plan will provide for the following injunctions:

### A.    Injunction

**Except as provided in the Plan or the Confirmation Order and other than with respect to a right of recoupment or a setoff, as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability subject to the Plan or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan will be permanently enjoined from taking any of the following actions in respect of any such Claims, debts, liabilities, Interests or rights:  (a) commencing or continuing in any manner any action or other proceeding against the Debtors or Newco, other than to enforce any right pursuant to the Plan to a distribution from Newco; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or Newco other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors or their respective property; (d) asserting a right of subrogation of any kind against any debt, liability or obligation due to the Debtors and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

### B.    Subordination Rights

The classification and manner of satisfying Claims and Interests under the Plan does not take into consideration subordination rights, and nothing in the Plan or Confirmation Order will affect any subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

### C.    Automatic Stay

Except as provided herein or otherwise determined by order of the Bankruptcy Court, the automatic stay imposed by operation of section 362 of the Bankruptcy Code will remain in full force and effect until the earlier of the time the Bankruptcy Cases are closed or dismissed.

## X.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Executory Contracts and Unexpired Leases to Be Rejected

On the Effective Date, except for the Executory Contracts or Unexpired Leases listed on Exhibit III to the Plan, if any, and except to the extent that a Debtor either previously has assumed, assumed and assigned or rejected an Executory Contract or Unexpired Lease by an order of the Bankruptcy Court or has filed a motion to assume or assume and assign an Executory Contract or Unexpired Lease prior to the Effective Date, each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code. Each contract and lease will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

### B.    Bar Date for Rejection Claims

Notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Rejection Claim will be forever barred and will not be enforceable against Newco unless a proof of Claim is Filed and served on Newco, pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date or another order of the Bankruptcy Court, no later than 30 days after the Effective Date.

## C.    Executory Contracts and Unexpired Leases to Be Assumed

### 1.    Assumption Generally

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code, Newco will assume each of the respective Executory Contracts and Unexpired Leases, if any, listed on Exhibit III to the Plan; *provided, however*, that the Debtors reserve the right, at any time prior to the Effective Date, to amend Exhibit III of the Plan to: (a) delete any Executory Contract or Unexpired Lease listed therein, thus providing for its rejection pursuant to the Plan; or (b) add any Executory Contract or Unexpired Lease to Exhibit III of the Plan, thus providing for its assumption pursuant to Section V.C.1 of the Plan. The Debtors will provide notice of any amendments to Exhibit III of the Plan to the parties to the Executory Contracts or Unexpired Leases affected thereby and to the parties on the then-applicable service list in the Bankruptcy Cases. Nothing in this Disclosure Statement or the Plan shall constitute an admission by a Debtor that any contract or lease is an Executory Contract or Unexpired Lease or that a Debtor has any liability thereunder.

Each Executory Contract or Unexpired Lease assumed under Section V.C.1 of the Plan shall include any modifications, amendments, supplements or restatements to such contract or lease.

### 2.    Assignments Related to Post-Effective Date Transactions

As of the Effective Date, any Executory Contract or Unexpired Lease assumed under Section V.C.1 of the Plan will be deemed assigned to Newco, pursuant to section 365 of the Bankruptcy Code.

### 3.    Approval of Assumptions and Assumption Procedures

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions described in Section V.C.1 of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. The procedures for assumption of an Executory Contract or Unexpired Lease are as follows:

- After the entry of the Confirmation Order, the Debtors will serve upon each party to an Executory Contract or Unexpired Lease being assumed pursuant to the Plan notice of: (i) the contract or lease being assumed or assumed and assigned; (ii) the Cure Amount Claim, if any, that the applicable Debtor believes it would be obligated to pay in connection with such assumption; and (iii) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

- Any entity wishing to object to (i) the proposed assumption of an Executory Contract or Unexpired Lease under the Plan or (ii) the proposed amount of the related Cure Amount Claim must file and serve on counsel to Newco a written objection setting forth the basis for the objection within 20 days of service of the notice.

- If no objection to the proposed assumption or Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease: (i) the proposed assumption of the Executory Contract or Unexpired Lease will be approved in accordance with the Plan and the Confirmation Order, effective as of the Effective Date, without further action of the Bankruptcy Court; and (ii) the Cure Amount Claim identified by the Debtors in the notice will be fixed and shall be paid in accordance with the Plan on or after the Effective Date, without further action of the Bankruptcy Court, to the appropriate contract or lease party identified on the notice.

- 27 -

- If an objection to the proposed assumption or Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease, Newco and the objecting party may resolve such objection by stipulation, without further action of the Bankruptcy Court.

- If an objection to the proposed assumption or Cure Amount Claim is properly filed and served prior to the objection deadline with respect to an Executory Contract or Unexpired Lease and the parties are unable to resolve such objection: (i) Newco may file a reply to such objection no later than 30 days after the filing and service of such objection and ask the Bankruptcy Court to schedule a hearing on the particular objection and the related reply at an appropriate time; or (ii) Newco may designate the Executory Contract or Unexpired Lease underlying such objection for rejection pursuant to Section V.A of the Plan and amend Exhibit III of the Plan accordingly.

### D.    Payments Related to the Assumption of Executory Contracts and Unexpired Leases

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code: (1) by payment of the Cure Amount Claim in Cash on or after the Effective Date; or (2) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Amount Claim will be allowed for a penalty rate or other form of default rate of interest. If there is an unresolved dispute regarding: (1) the amount of any Cure Amount Claim; (2) the ability of Newco or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (3) any other matter pertaining to assumption of such contract or lease, the payment of any Cure Amount Claim required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

## XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

### A.    General

A description of the United States federal income tax consequences of the Plan is provided below. This description is based on the Internal Revenue Code, Treasury Regulations issued thereunder, judicial decisions and administrative determinations, all as in effect on the date of this Disclosure Statement and all subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause the United States federal income tax consequences of the Plan to differ materially from the consequences described below.

To ensure compliance with U.S. Treasury Department Circular 230, holders of Claims are hereby notified that (a) the discussion of United States federal tax issues in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon by holders, for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the solicitation of votes in favor of the Plan; and (c) holders should seek advice based on their particular circumstances from their own independent tax advisors.

The United States federal income tax consequences of the Plan are complex and in important respects uncertain. No ruling has been requested from the Internal Revenue Service; no opinion has been requested from Debtors' counsel concerning any tax consequence of the Plan; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtors or holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and non-U.S. taxpayers, nor does it address tax consequences to holders of Interests in the Debtors. In addition, the description does not discuss state, local or non-U.S. tax consequences.

- 28 -

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each holder of a Claim or Interest. Holders of Claims or Interests are urged to consult with their own tax advisors regarding the federal, state, local and non-U.S. tax consequences of the Plan.

**B.      United States Federal Income Tax Consequences of Payment of Allowed Claims**

The United States federal income tax consequences of Plan implementation to the holders of Allowed Claims will depend on, among other things, the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether the holder's Claim is allowed or disputed on the Effective Date, and whether the holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

**C.      Recognition of Gain or Loss**

**1.      In General**

In general, a holder of a Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's basis in the Claim. Any gain or loss recognized may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, its deduction of the loss may be subject to limitation. The holder's amount realized in respect of a Claim generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the holder under the Plan on the Effective Date and on subsequent distribution dates, less the amount (if any) treated as interest, as discussed below.

**2.      Post-Effective Date Cash Distributions**

Because certain holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Internal Revenue Code may apply to treat a portion of the subsequent distributions as interest, which is generally taxed as ordinary income. Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

**3.      Bad Debt or Worthless Securities Deduction**

A holder that, under the Plan, receives in respect of an Allowed Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

**D.      Certain Other Tax Consequences for Holders of Claims**

**1.      Receipt of Pre-Effective Date Interest**

A holder of an Allowed Claim will recognize ordinary income to the extent the holder receives Cash or other property that is allocable to accrued but unpaid interest that the holder has not previously included in its taxable income. If an Allowed Claim includes interest, and if the holder receives less than the amount of the Claim pursuant to the Plan, the holder will be required to allocate the Plan consideration between principal and interest with respect to the Claim. The proper allocation of plan consideration between principal and interest is unclear, and

- 29 -

holders of Allowed Claims should consult their own tax advisors in this regard. If the Plan consideration allocated to interest with respect to an Allowed Claim is less than the amount that the holder has previously included as interest income, the previously-included but unpaid interest may be deducted, generally as a loss.

### 2.    Installment Method

A holder of an Allowed Claim constituting an installment obligation for Tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of § 453B of the Internal Revenue Code.

### 3.    Information Reporting and Withholding

Under the Internal Revenue Code's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### E.    Tax Consequences of Consummation of Plan to Debtors and Newco

The Debtors expect to recognize substantial cancellation of indebtedness income on consummation of the Plan but the income will not be taxable to the Debtors. The Debtors will retain their net operating losses and other tax attributes until the Debtors are liquidated or the tax attributes are eliminated as a result of the excluded cancellation of indebtedness income.

Any payments that Newco receives under the Purchaser Note will be treated in part as taxable interest income pursuant to the Internal Revenue Code's imputed interest rules. Newco will also be taxed on any income generated by Cash or other assets in the Disputed Claims Reserve. Newco will be entitled to deduct interest expense to the extent that distributions are treated in part as interest.

## XII.    ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. The Debtors will file all exhibits to the Plan with the Bankruptcy Court and make them available for review on the Document Website (**www.kccllc.net/boscov**) no later than ten days before the Voting Deadline.

## XIII.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims in Classes 3 and 4 to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline

Dated:  March 16, 2009

Respectfully submitted,

BSCV, INC., on its own behalf and on behalf of each
affiliate Debtor

By:

Name:   **Michael J. Hughes**
Title:    **Chief Executive Officer**

CHI-1695199v1